# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| JOHNNY EDWARD MCMAHON,<br><br>Petitioner,<br><br>v.<br><br>NEVEN, et al.,<br><br>Respondents. | Case No. 2:14-cv-00076-APG-CWH<br><br>**ORDER** |

Johnny Edward McMahon's 28 U.S.C. § 2254 counseled, second-amended habeas corpus petition is before the court for disposition on the merits.

## I.    **Background**

On May 7, 2008, a jury found McMahon guilty of three counts of sexual assault of a minor under age sixteen (counts 1, 3, 5), three counts of statutory sexual seduction (counts 2, 4, 6), and one count of open and gross lewdness (count 7).  Exhibit 26.[1]  The state district court sentenced McMahon on counts 1, 3, and 5 to three terms of twenty years to life; on count 7 to twelve months in the Clark County Detention Center; all counts to run concurrently.  Exh. 33.  The state district court imposed a sentence of lifetime supervision and struck counts 2, 4, and 6.  *Id.*  Judgment of conviction was entered on July 29, 2008.  *Id.*

---

[1] Exhibits to petitioner's second-amended petition, ECF No. 31, are found at ECF Nos. 12-25, 32, and 43. Respondents' exhibits are found at ECF No. 40.

McMahon's trial counsel, Paul Wommer, represented him on appeal. Exh. 3. The Nevada Supreme Court affirmed the convictions on October 16, 2009, and remittitur issued on December 22, 2009. Exhs. 57, 63.

In the meantime, McMahon had filed a *pro per* petition for writ of mandamus with the Nevada Supreme Court on January 6, 2009. Exh. 47. McMahon argued, among other claims, that the state district court erred in re-appointing Wommer for the appeal and that such representation created a conflict of interest. The Nevada Supreme Court issued an order denying the petition on January 15, 2009. Exh. 48.

McMahon filed a *pro per* state postconviction petition for writ of habeas corpus on May 21, 2010. Exh. 83. The state district court appointed Rochelle T. Nguyen to represent McMahon, and Nguyen filed a supplemental petition on March 22, 2011. Exhs. 98, 99, 100. After an evidentiary hearing, the state district court denied the petition on February 14, 2012. Exh. 109. On May 15, 2013, while McMahon's appeal was pending before the Nevada Supreme Court, Nguyen filed a motion to remand to state district court. Exh. 122. She cited to the April 19, 2013 federal conviction of former counsel Wommer of three counts of structuring financial transactions, one count of tax evasion and one count of making and subscribing a false tax return, statement or other document. *Id.* She also indicated that at his bench trial Wommer presented the defense that he had diminished mental capacity due to a 1991 skiing accident that left him unable to understand tax laws. *Id.*

On June 13, 2013, the Nevada Supreme Court affirmed the denial of the state postconviction petition. Exh. 124. In the order, the state supreme court addressed the motion to remand and stated that the state district court had already resolved the state postconviction petition, and therefore, McMahon must bring a new petition in district court. *Id.* at n.1.

McMahon filed a second *pro per* state postconviction petition on April 24, 2013. Exh. 121. He ultimately filed a second-amended petition on September 10, 2013. Exh.

138.  In the amended petition he set forth numerous grounds, including his claim that newly discovered evidence indicated that Wommer lacked the mental capacity to effectively represent McMahon at trial and on appeal.  Exh. 138 (ECF No. 23, pp. 9-34, 64-77).  The Nevada Supreme Court affirmed the denial of the second state postconviction petition on September 16, 2014.  Exh. 186.  Remittitur issued on October 15, 2014.  Exh. 187.

McMahon dispatched his federal habeas petition for filing about January 10, 2014 (ECF No. 6).  This court appointed counsel, and counsel ultimately filed a second-amended petition on August 4, 2014 (ECF No. 31).

On September 28, 2015, this court granted respondents' motion to dismiss in part, concluding that grounds 3 and 5(B) were unexhausted (ECF No. 51, pp. 4, 6).  McMahon thereafter filed a declaration of abandonment of those grounds (ECF No. 53).  Respondents filed their answer to the second-amended petition (ECF No. 58), and McMahon replied (ECF No. 63).

II.    **AEDPA Standard of Review**

28 U.S.C. § 2254(d), a provision of the Antiterrorism and Effective Death Penalty Act (AEDPA), provides the legal standards for this court's consideration of the petition in this case:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court

convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693-694 (2002). This Court's ability to grant a writ is limited to cases where "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer*, 538 U.S. at 73 (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell*, 535 U.S. at 694.

A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 74 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id.* (quoting *Williams*, 529 U.S. at 409).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas

review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir.2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973. Rather, AEDPA requires substantially more deference:

> .... [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir.2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence. The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Cullen*, 563 U.S. at 181.

### III.     **Instant Petition**

### Ground 1

McMahon contends that the improper joinder of charges violated his Fifth, Sixth and Fourteenth Amendment rights to due process and a fair trial (ECF No. 31, pp. 14-15). McMahon was charged in an information with three counts of sexual assault of a minor under sixteen years of age and three counts of statutory sexual seduction with respect to victim E.H.  In the same information, he was charged with one count of open or gross lewdness with respect to victim S.K.  *Id.*

A court may grant habeas relief on a joinder challenge only "if the joinder resulted in an unfair trial. There is no prejudicial constitutional violation unless 'simultaneous trial of more than one offense ... actually render[ed] petitioner's state trial fundamentally unfair and hence, violative of due process.'" *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir.

2004) (quoting *Sandoval v. Calderon*, 241 F.3d 765, 771–72 (9th Cir.2001). As to prejudice, the court must ask "'if the impermissible joinder had a substantial and injurious effect or influence in determining the jury's verdict.'" *Davis*, 384 F.3d at 638 (quoting *Sandoval*, 241 F.3d at 772); *see also Bean v. Calderon*, 163 F.3d 1073, 1086 (9th Cir.1998). The Ninth Circuit explained that it considers in particular the cross-admissibility of evidence and the danger of "spillover" from one charge to another, especially where one charge or set of charges is weaker than another. *Davis*, 384 F.3d at 638; *see also, e.g., Sandoval*, 241 F.3d at 772; *Bean*, 163 F.3d at 1084.

E.H. testified at trial as follows. Exh. 21, pp. 38-56. When she was fourteen, she met McMahon and R., his four-year-old daughter, at a park in Las Vegas. McMahon asked her whether she babysat and also asked her if she was a virgin. *Id.* at 39-40. She thought the question was disturbing but was not really paying attention because she was "absentminded." *Id.* at e.g., 52. She agreed to babysit for him and went back to his apartment. McMahon took E.H. into the bathroom, blocked her way out, locked the door, made her perform oral sex on him, and then he performed oral sex on her. *Id.* at 39-40.

E.H. testified that her mother was pleased she had a job, so E.H. babysat for R. most weekends for three or four months. She testified to specific incidents when McMahon had sexual intercourse with her and stated that he had sexual intercourse with her between 10 and 20 times, he performed oral sex on her between 10 and 20 times, and her mouth was on McMahon's penis once or twice. *Id.* at 43, 50-52. The incidents occurred over about a four-month-period beginning in July 2004. *Id.* at 38, 45. She stated that about one year later, McMahon dropped a birthday card off for her with $20 in it. At that point, E.H. and her mother contacted police again; police told E.H. to set up a meeting with McMahon. She called McMahon and asked him to meet her at 7-Eleven. Police arrested McMahon when he arrived at 7-Eleven. *Id.* at 48-50.

6

Defense counsel elicited testimony on cross-examination that when E.H. described the first incident to her mother and to police the first time she was interviewed she did not say that McMahon performed oral sex on her. *Id.* at 52-53.

S.K. also testified at trial. Exh. 22, pp. 4-11. She stated that she usually babysat for McMahon's daughter R. at R.'s mother's apartment. The only time she babysat for R. at McMahon's apartment was during the summer of 2004; she was fourteen. She was tired, and McMahon told her to go into his bedroom and go to sleep. She fell asleep on McMahon's bed; when she woke up McMahon had his hand down her pants, underneath all of her clothing, and was rubbing her vagina. She stated that she had been sleeping soundly, and she was unsure how long this went on: "It felt like quite a while; I would say like 20 minutes, but it possibly could have gone on for two. But in my mind it felt like longer." *Id.* at 6; *see also id.* at 9-10. S.K. picked up the phone to call her mother, she hung up when McMahon told her not to call. He gave her $20. *Id.* at 5-6.

Affirming the convictions, the Nevada Supreme Court reasoned:

> McMahon argues that the counts were improperly joined because the offenses relating to E.H. and S.K. were not part of a common scheme or plan. We disagree. NRS 173.115; *Griego v. State*, 893 P.2d 995, 998-999 (Nev. 1995), abrogated on other grounds by *Koerschner v. State*, 13 P.3d 451 (Nev. 2000), modified on other grounds by *State v. Dist. Ct.* (Romano), 97 P.3d 594, 600 (Nev. 2004), overruled by *Abbott v. State*, 138 P.3d 462 (Nev. 2006).

> Pursuant to NRS 173.115, two or more offenses may be charged in the same information if the offenses are based on the same act or transaction or are part of a common scheme or plan. In *Griego*, this court found a common scheme or plan where the victims were all the same gender, were friends with Griego's children, and the assaults took place in the same place around the same time. *Id.* Here, both of the victims were 14 years of age, McMahon invited both victims to his residence to babysit his daughter and sexually assaulted or committed lewd acts with the victims, and the offenses occurred similarly close in time. Further, both victims testified that McMahon offered them $20 following sexual acts. Therefore, we conclude that the district court did not abuse its discretion in this regard because the offenses were part of a common scheme or plan.

7

Exh. 57, pp. 6-7.

McMahon argues in his reply that the Supreme Court of Nevada made an unreasonable determination of fact, thus requiring this court to review the federal constitutional claim *de novo* (ECF No. 63, p. 14). Indeed, "where the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable." *Taylor*, 366 F.3d at 1001; *see also Milke v. Ryan*, 711 F.3d 998, 1008 (9th Cir. 2013). McMahon argues that a discrepancy regarding the import and timing of $20 payments to the alleged victims was an unreasonable determination of fact triggering de novo review. The Supreme Court of Nevada, while finding McMahon's molestation of both victims were part of a common scheme or plan, found that "McMahon offered [both fourteen-year-old victims] $20 following sexual acts." Exh. 57, p. 6. McMahon counters that, while that is factually accurate, it is misleading because one victim received the $20 immediately following the sexual acts and the other received it almost a year later. *See* exh. 21, p. 205; exh. 22, p. 12. However, the Supreme Court of Nevada's factually correct statement did not "plainly misapprehend or misstate the record." *Taylor*, 366 F.3d at 1001. McMahon did pay both victims $20. But even if this was a plain misstatement, it did not "go[] to a material factual issue," *id.*, as the Supreme Court of Nevada rejected McMahon's federal constitutional claim because he failed to demonstrate prejudice, not because his molestation of both victims was part of a common scheme or plan—that was the state-law issue. *See* exh. 57, pp. 6–7, 7 n.2.

Accordingly, this claim is not subject to *de novo* review; AEDPA deference applies to the Nevada Supreme Court's determination. McMahon has not shown that the Nevada Supreme Court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the U.S. Supreme Court, or was

8

based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d); *see Runningeagle v. Ryan*, 686 F.3d 758, 776–77 (9th Cir. 2012) (no U.S. Supreme Court precedent exists for improper joinder or severance).  Federal habeas relief, therefore, is denied as to ground 1.

**Ground 2**

McMahon asserts that insufficient evidence supported the convictions, in violation of his Fifth and Fourteenth Amendment due process rights (ECF No. 31, pp. 15-17).

"The Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 309 (1979) (citing *In re Winship*, 397 U.S. 358 (1970)).  On federal habeas corpus review of a judgment of conviction pursuant to 28 U.S.C. § 2254, the petitioner "is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id.* at 324.  "[T]he standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law."  *Id.* at 324 n.16.  On habeas review, this court must assume that the trier of fact resolved any evidentiary conflicts in favor of the prosecution and must defer to such resolution.  *Id.* at 326.  Generally, the credibility of witnesses is beyond the scope of a review of the sufficiency of the evidence.  *Schlup v. Delo*, 513 U.S. 298, 330 (1995).

The testimony of the two victims is described above with respect to ground 1. McMahon's former girlfriend, the mother of their daughter, R., testified that in the winter of 2005, when R. was five, she was putting her daughter to bed when R. started explaining to her mother what she had seen McMahon and E.H. doing.  Exh. 23, pp. 10-11.  R. put one of her dolls on top of the other and was moving them around.  R. also told her mother that she had seen McMahon kissing E.H. on the mouth, and McMahon told her he did it because E.H. was like R.'s sister.  *Id.*  A police officer testified that R. told him in March 2005 that E.H. was McMahon's girlfriend and that she had seen E.H.

9

laying on top of McMahon on the bed and had seen them "French" kissing and having sex. Exh. 23, pp. 18-19.

R. was age eight at trial. She testified that she did not remember any of the incidents between E.H. and McMahon that she had recounted to her mother and police. She testified that E.H. spent the night at McMahon's apartment and that the three of them slept in the same bed together. *Id.* at 9-12.

Evidence was also introduced that E.H.'s DNA was found on a comforter from McMahon's bed. Exh. 23, p. 24. A nurse practitioner who has testified in a number of court cases as a child sexual abuse expert testified that she examined E.H., and E.H. had injuries consistent with a child who has been sexually assaulted. Exh. 22, pp. 20-25.

McMahon acknowledged at trial that within four days of his October 3, 2004 interview with police about the E.H. incidents, he dropped out of his final semester of school, rented a moving van, returned his rented computer, moved to Texas, and changed his phone number. He testified that he left Las Vegas abruptly to help his mother, who had suffered a fall, relocate to assisted living in Florida. Exh. 24, pp. 8-12, 28-31, 39.

Rejecting the insufficiency of the evidence claim on direct appeal, the Nevada Supreme Court explained its conclusion that sufficient evidence supported the verdict:

> Citing to *State v. Purcell*, 110 Nev. 1389, 887 P.2d 276 (1994), for support, McMahon contends that the evidence presented was insufficient to support the jury's verdict because the witnesses were not credible and had motives to fabricate and there was no corroborating scientific evidence.

> Our standard of review in determining the sufficiency of the evidence is "'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Rose v. State*, 123 Nev. 194, 202, 163 P.3d 408, 414 (2007) (quoting *Origel-Candido v. State*, 114 Nev. 378, 381, 956 P.2d 1378, 1380 (1998). When considering the sufficiency of the evidence in sexual assault cases, we have held that the victim's testimony alone is sufficient to uphold a

conviction. *LaPierre v. State*, 108 Nev. 528, 531, 836 P.2d 56, 58 (1992). Although the victim's testimony need not be corroborated, "the victim must testify with some particularity regarding the incident in order to uphold the charge." *Id.*

In *Purcell*, Purcell was convicted of lewdness and sexual assault. The victim was the State's only witness. 110 Nev. at 1391-92, 887 P.2d at 277. Defense counsel presented five witnesses who testified that the victim had a history of lying and had a motive to lie because she wanted to live with her father instead of her mother. *Id.* at 1392, 887 P.2d at 277-78. The district court granted a new trial, stating that the evidence of guilt was conflicting, the victim's testimony was inconsistent, and the victim had a motive to fabricate. *Id.*

Unlike *Purcell*, in the present case, the victims' testimony was not the only evidence that the State presented and their testimony was not unduly inconsistent. One of the minor victims, E.H., testified that McMahon took her to his apartment on several occasions and subjected her to sexual acts against her will. E.H. testified that a sexual relationship continued for over a year. E.H.'s DNA was found on a comforter from McMahon's bed. McMahon's ex-wife and a police officer testified that McMahon's daughter had described witnessing a sexual act between McMahon and E.H., although the daughter testified that she could not recall making such statements.

McMahon's claim that E.H.'s testimony was inconsistent arises from her testimony (1) that she did not have a problem lying about her age to gain access to an adult website, (2) about a sexual act that she did not mention in police statements or at the preliminary hearing, and (3) that she was "absent-minded."

The second minor victim, S.K., testified that she was babysitting McMahon's daughter, fell asleep on McMahon's bed, and was awoken by McMahon fondling her genital areas.

McMahon's claim that S.K.'s testimony was inconsistent arises from her testimony that (1) she was sleeping soundly when the incident took place, (2) the incident lasted 2 minutes when she first reported that it lasted 20 minutes, and (3) she couldn't identify pictures of McMahon's apartment.

McMahon testified that there was never a sexual relationship with either of the victims but that the girls did babysit his daughter. He testified that he had loaned money to both mothers of the victims and that they did not pay him back. He claimed that the reason for the accusations against him was because the mothers were avoiding paying back the loans and they motivated their daughters to lie. McMahon also testified that he had

fired E.H. because she invited people over and was using his computer to access adult websites.

"[I]t is the jury's function, not that of the court, to assess the weight of the evidence and determine the credibility of witnesses." *McNair v. State*, 108 Nev. 53, 56, 825 P.2d 571, 573 (1992). Here, the jury was presented with the contradictory testimony of the victims and McMahon and despite the minor inconsistencies in the testimony of the victims, determined that their testimony was credible. Further, contrary to McMahon's contention, there was corroborating evidence supporting E.H.'s testimony, including the discovery of E.H.'s DNA on McMahon's comforter and the nurse practitioner's testimony supporting sexual assault [FN]. Thus, there was sufficient evidence presented to support the jury's verdict.

[FN] We note that there was no corroborating evidence supporting S.K.'s testimony. However, corroborating evidence would not likely be present because of the nature of McMahon's conduct—lewdness involving touching which occurred once briefly with no witnesses.

Exh. 57, pp. 1-4.

McMahon has presented nothing that demonstrates that the Nevada Supreme Court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Accordingly, federal habeas relief is denied as to ground 2.

**Grounds 4 & 5**

McMahon argues that his counsel, Paul Wommer, was ineffective at trial and on appeal in violation of his Sixth and Fourteenth Amendment rights. Ineffective assistance of counsel (IAC) claims are governed by the two-part test announced in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court held that a petitioner claiming ineffective assistance of counsel has the burden of demonstrating that (1) the attorney made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment, and (2) that the deficient performance prejudiced the defense. *Williams*, 529 U.S. at 390-91 (citing *Strickland*, 466 U.S. at 687). To establish ineffectiveness, the defendant must show that

12

counsel's representation fell below an objective standard of reasonableness. *Id.* To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* A reasonable probability is "probability sufficient to undermine confidence in the outcome." *Id.* Additionally, any review of the attorney's performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct, in order to avoid the distorting effects of hindsight. *Strickland*, 466 U.S. at 689. It is the petitioner's burden to overcome the presumption that counsel's actions might be considered sound trial strategy. *Id.*

Ineffective assistance of counsel under *Strickland* requires a showing of deficient performance of counsel resulting in prejudice, "with performance being measured against an objective standard of reasonableness, . . . under prevailing professional norms." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (internal quotations and citations omitted). When the ineffective assistance of counsel claim is based on a challenge to a guilty plea, the *Strickland* prejudice prong requires a petitioner to demonstrate "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

If the state court has already rejected an ineffective assistance claim, a federal habeas court may only grant relief if that decision was contrary to, or an unreasonable application of, the *Strickland* standard. *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.*

The United States Supreme Court has described federal review of a state supreme court's decision on a claim of ineffective assistance of counsel as "doubly deferential." *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 129 S.Ct. 1411, 1413 (2009)). The Supreme Court emphasized that: "We take a 'highly deferential' look at counsel's

performance . . . through the 'deferential lens of § 2254(d).'" *Id.* at 1403 (internal

citations omitted). Moreover, federal habeas review of an ineffective assistance of

counsel claim is limited to the record before the state court that adjudicated the claim on

the merits. *Cullen*, 563 U.S. at 181-84. The United States Supreme Court has

specifically reaffirmed the extensive deference owed to a state court's decision

regarding claims of ineffective assistance of counsel:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.* at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S. at ——, 129 S.Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S. at ——, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 562 U.S. at 105. "A court considering a claim of ineffective assistance of

counsel must apply a 'strong presumption' that counsel's representation was within the

'wide range' of reasonable professional assistance." *Id.* at 104 (quoting *Strickland*, 466

U.S. at 689). "The question is whether an attorney's representation amounted to

incompetence under prevailing professional norms, not whether it deviated from best

practices or most common custom." *Id.* (internal quotations and citations omitted).

**IAC Claims Raised in First State Postconviction Petition**

McMahon claims that his counsel was ineffective at trial for failing to: (4A): move to

sever the charges of the two complainants; (4B): challenge the State's flight instruction;

(4C): move to dismiss the case in justice court; (4D): challenge prosecutorial

misconduct; (4E): conduct an adequate investigation: (4F): retain an expert witness to

testify; and (4G): request a competency exam of McMahon's daughter (ECF No. 31, pp.

18-27).

McMahon further claims Wommer was ineffective on appeal.  He argues that (5A): counsel failed to communicate with him and failed to file a reply brief with the Nevada Supreme Court, and (5D): counsel failed to challenge the flight instruction on appeal (ECF No. 31, pp. 30-31, 33-35).

**Ground 4(A)**

Affirming the denial of McMahon's claim that Wommer was ineffective for failing to move to sever the charges of the two complainants, the Nevada Supreme Court explained that it had already determined that the counts were properly joined because they were part of a common scheme or plan and thus trial counsel was not ineffective. Exh. 124, p. 2.

McMahon argues that the Nevada Supreme Court unreasonably applied *Strickland*, because that court's previous determination was only as to whether the counts were properly joined, not whether the state district court, "if faced with a timely motion to sever, . . . would have severed the charges."  ECF No. 63 at 23.  McMahon essentially claims that the jury would not have believed that he sexually assaulted either girl without the testimony from the other.

Even if this court reviewed ground 4(A) *de novo*, McMahon has to show not only that the trial court would have granted a severance and that the failure to file such a motion fell below the wide range of acceptable conduct of counsel, but also that had the court granted the severance, a different outcome was reasonably probable. *See Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). Evidence was presented that McMahon's sexual encounters with his victims demonstrated that he had developed a common scheme/plan to prey upon unsuspecting minors by luring them to his home using his own daughter as bait.  McMahon cannot demonstrate a reasonable probability of a different outcome had trial counsel moved to sever.

McMahon has failed to show that the Nevada Supreme Court's decision was contrary to, or involved an unreasonable application of, clearly established federal law,

as determined by the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

**Grounds 4(B) and 5(D)**

McMahon contends that Wommer was ineffective for failing to challenge the State's flight instruction at trial (4(B)) and on appeal (5(D)).  The jury was instructed:

> the flight of a person immediately after the commission of a crime or after he is accused of a crime is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in light of all the other proved facts in deciding the question of his guilt.  Whether or not evidence of flight shows a consciousness of guilt and the significance to be attached to such a circumstance are matters for your deliberation.

Jury instruction no. 13, exh. 25, p. 16.

McMahon argued that counsel should have objected because the evidence at trial demonstrated that he moved to Texas to help his mother, not to flee from law enforcement (ECF No. 63, p. 27).  Wommer testified at the evidentiary hearing on the first state postconviction petition that he did not challenge the State's proffered flight instruction because he believed that there was a basis for the State to request a flight instruction and no viable argument against its inclusion.  Exh. 108, p. 21.  He noted that, shortly after McMahon went to the police station and provided a statement to a detective, McMahon dropped out of his last semester of college, returned his rented computer, left Las Vegas, and went to Texas.  *Id.*

The Supreme Court of Nevada rejected this claim because "there was sufficient evidence for a jury to reasonably infer flight."  Exh. 124, p. 2 (citing *Carter v. State*, 121 P.3d 592, 599 (Nev. 2005): "[i]t is proper to instruct on flight where it is reasonable to infer flight from the evidence presented").  While McMahon is correct that evidence supported the inference that he fled the state to help his mother, evidence was also presented from which a jury could infer that he fled to avoid law enforcement.  *See* exh. 24, p. 30.  As that is sufficient, McMahon cannot demonstrate that any objection would

have had any likelihood of being granted and thus cannot demonstrate a reasonable probability of affecting the outcome. Nor can McMahon demonstrate a reasonable probability of a different outcome had Wommer raised this issue on direct appeal.

McMahon, therefore, has not demonstrated that the Nevada Supreme Court's decision affirming the denial of these claims was contrary to, or involved an unreasonable application of, *Strickland*, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

**Ground 4(C)**

McMahon asserts that trial counsel was ineffective for failing to move to dismiss his case in justice court because he was not brought before a magistrate judge for a probable cause determination within forty-eight hours of being arrested (ECF No. 31, p. 24). McMahon points out that he had the right to either a probable cause hearing within 48 hours of his arrest or the right to be arrested pursuant to an arrest warrant. *See Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 56–58 (1991); *Gernstein v. Pugh*, 420 U.S. 103, 116 n.18 (1975). The Supreme Court of Nevada rejected this claim because McMahon "failed to establish by a preponderance of the evidence that a magistrate did not make a probable cause determination within forty-eight hours." Exh. 124, p. 2. Moreover, it concluded that "McMahon failed to establish resulting prejudice." *Id.*

McMahon was arrested on December 12, 2005. Exh. 1. He was booked for a traffic violation, sexual assault, and open and gross lewdness. *Id.* It appears that he saw a magistrate judge the following day who found probable cause for the traffic violation and sex offenses. Exh. 24, pp. 119-120; *see also* exh. 5, p. 52. Moreover, the State did provide a November 6, 2005 warrant at the state evidentiary hearing on the first state postconviction petition. Exh. 108, pp. 47–48, 70. Further, at McMahon's trial, a police officer testified that a warrant issued for McMahon's arrest about April 2005. Exh. 24, pp. 119-120.

McMahon has not demonstrated that the Supreme Court of Nevada's affirmance of the denial of this claim involved an unreasonable determination of fact or was contrary to or an unreasonable application of clearly established U.S. Supreme Court case law.

**Ground 4(D)**

McMahon contends that trial counsel was ineffective for failing to challenge prosecutorial misconduct in light of the fact that the State claimed, at the probable cause hearing, that McMahon was arrested pursuant to an arrest warrant, but that McMahon told his counsel that he was not (ECF No. 31, p. 25). The Supreme Court of Nevada rejected this claim on the merits because McMahon "fail[ed] to make out a colorable claim of prosecutorial misconduct." Exh. 124, p. 3. As the court summarily rejected the claim, McMahon must show that "there was no reasonable basis for the state court to deny relief." *Harrington*, 562 U.S. at 98. In light of the fact that there was an arrest warrant as discussed in ground 4(C), above, McMahon cannot demonstrate prejudice. McMahon has not shown that the Supreme Court of Nevada's determination involved an unreasonable determination of fact or was contrary to or an unreasonable application of clearly established U.S. Supreme Court case law.

**Ground 4(E)**

McMahon argues that trial counsel was inadequate because he failed to conduct an adequate investigation (ECF No. 31, p. 25). McMahon states that trial counsel met with only one government witness: McMahon's daughter (ECF No. 63, p. 33; *see* exh. 108, p. 23). While McMahon ended up hiring an investigator himself, he argues that his counsel never did any investigating (ECF No. 63, p. 33; *see* exh. 108, pp. 22, 81–82). He also complains that counsel did not "conduct an independent medical examination" of E.H., even though another examination had been done, because "[i]t was clear to everyone at trial that E.H. had some form of cognitive or mental health issue" (ECF No. 63, p. 33). McMahon contends that counsel should have tried to subpoena the computer that McMahon returned to Aaron Rents months earlier than counsel did,

which would have shown that E.H. was visiting adult websites on McMahon's computer. McMahon testified at trial that this was one of the reasons he fired E.H.   Similarly, McMahon contends that counsel should have subpoenaed cell phone records showing that, as he claimed, E.H. called him while he was in Texas, which E.H. denied.  And he contends that counsel should have called his landlord to testify that E.H. brought people to McMahon's house when McMahon wasn't home, which would have contradicted E.H.'s testimony that she only ever babysat when McMahon was home.  *Id.* at 33-35.

In addressing these issues, the state district court found:

> Defendant further claimed that Mr. Wommer should have called additional witnesses at his trial.  Mr. Wommer indicated that he initially thought about calling the Defendant's daughter as a witness, but the State decided to call her as a witness so he did not need to call her as well. Moreover, Mr. Wommer indicated that he and the Defendant had discussed calling the Defendant's friend, Dr. Chamberlain, but that Mr. Wommer ultimately decided not to use him as a witness.

> To the extent that Defendant claims there were additional witnesses that Mr. Wommer should have presented during his case-in-chief, Defendant fails to explain what additional witnesses he wished to have presented at his trial or how those additional witnesses would have changed the outcome of his proceeding. . . .

> Defendant also claimed that Mr. Wommer should have filed a challenge to the competence of E.H., E.H.'s mother, and his daughter R.M.'s ability to testify.  Mr. Wommer indicated that he did not object to the competency of these three witnesses to testify because there was no reason to challenge E.H. or her mother, and the State had already qualified R.M. to testify.

> Mr. Wommer was not ineffective for failing to challenge the competency of these witnesses to testify.

> Defendant claimed that Mr. Wommer also should have hired an investigator to conduct a more thorough investigation into his case. Although Mr. Wommer indicated that he did not hire an investigator because this was a question of "she said/he said," Defendant claimed during his testimony that Jim Thomas was actually hired to help investigate this case.  Nonetheless, Defendant failed to explain exactly how this investigator would have changed the outcome of his case.  In addition, Defendant failed to explain what additional defense he wished to present.  Defendant testified at trial and testified that the victims were lying

19

because their mothers owed him money.  This information was presented to the jury and the jury was free to give whatever merit they saw fit to his defense.

Defendant failed to demonstrate that he was prejudiced by counsel's failure to hire an investigator.  In addition, Defendant failed to demonstrate that he was prejudiced by counsel's alleged failure to present any additional defenses.

Defendant claimed that Mr. Wommer was ineffective for failing to challenge the fact that his computer was not retained by the Las Vegas Metropolitan Police Department ("LVMPD") and that counsel failed to subpoena computer records regarding internet usage.  Mr. Wommer indicated that he did actually file a motion to dismiss based upon the fact that the computer was not retained by the LVMPD and his motion was denied following an evidentiary hearing.  In addition, Mr. Wommer testified that Defendant also went to Aaron's Rents where he returned the computer and attempted to get information from there himself.  Mr. Wommer indicated that Defendant was unsuccessful in locating his computer given the time gap between Defendant's return of the computer and the trial.

To the extent that Defendant is challenging Mr. Wommer's failure to retain a computer expert at trial to testify about internet records and counsel's failure to subpoena internet records, Defendant failed to present any evidence that it would even have been possible to retrieve internet records that would have been helpful to his case. Defendant failed to present any evidence that the internet records could delineate who had actually used his computer or what they had actually searched.  In light of the fact that Defendant returned his computer himself prior to leaving the State of Nevada for Texas, the fact that counsel did actually challenge the LVMPD's failure to keep the computer, and the fact that Defendant failed to demonstrate that the outcome of his case would have been different with this information, Defendant fails to demonstrate that Mr. Wommer was ineffective with regards to this computer evidence.

Exh. 109, pp. 5-7.

The Supreme Court of Nevada affirmed the denial of this claim because McMahon failed to establish prejudice. Exh. 124, p. 3.

Wommer testified at the evidentiary hearing on McMahon's first state postconviction petition.  Exh. 108, pp. 5-77.  He stated that he was unable to locate his file in this case, but reviewed the State's file before the evidentiary hearing.  At the time of the hearing, Wommer had been in practice in Nevada for more than thirty years; he had worked as a

defense attorney for more than sixteen years, and before that he served as a state district attorney and a United States Attorney. He had represented hundreds of clients and had prosecuted thousands. *Id.* at 37-38.

Wommer stated that he had been retained for trial. He described his thought process and strategic decisions. Wommer testified that as far as he recalled McMahon returned the computer himself to Aaron's Rents a long time before the computer became an issue in the case. He said that he and McMahon discussed subpoenaing the computer; McMahon went to the store to see if they still had the computer, and they did not. He testified that he did not further investigate the DNA evidence because McMahon acknowledged that the girls had been in the apartment. He did not recall there being any issue regarding E.H.'s mother's competency. He said he did not challenge R.'s competency because if the State hadn't called her the defense planned to call her. He did challenge the fact that the trial court permitted the sexual assault nurse's testimony. He stated that a main strategy was developing McMahon's trial testimony so that he was more credible than the alleged victims. *Id.* at 25-29, 43-45, 55, 58-60, 62-65, 72-74.

McMahon testified at the evidentiary hearing that he wanted Wommer to call his friend and landlord Dr. Chamberlain to testify "in regard to the misdemeanor count with S.K." but he did not explain what that testimony would have been. Wommer recalled that Chamberlain would have been primarily a character witness and acknowledged on cross examination that character witnesses would have opened the door to McMahon's impeachment with evidence of his past convictions. *Id.* at 57.

McMahon does not present any evidence that any investigation would have supported his version of events. Unsubstantiated conjecture does not carry a habeas petitioner's burden, and therefore, McMahon has not carried his burden of proving prejudice. The Supreme Court of Nevada's determination that McMahon failed to establish prejudice from his counsel's failure to investigate did not involve an

unreasonable determination of fact, nor was it contrary to or an unreasonable application of clearly established U.S. Supreme Court case law.

**Ground 4(F)**

McMahon contends that trial counsel was ineffective because he failed hire and call expert witnesses to testify (ECF No. 31, p. 26). The Supreme Court of Nevada rejected this argument because McMahon failed to establish prejudice. Exh. 124, p. 3. For the same reasons as with respect to ground 4(E), above, ground 4(F) provides no basis for habeas relief.

**Ground 4(G)**

McMahon argues that Wommer was ineffective because he failed to request a competency exam for McMahon's daughter, R. (ECF No. 31, p. 27). R. was four years old at the time of the incidents, and McMahon asserts that she would have been deemed incompetent because she did not remember saying or seeing certain things. Under Nevada law, courts may hold competency hearings when there is reason to question the competence of child witnesses and may exclude the testimony if the witness is not competent. *See Evans v. State*, 28 P.3d 498, 509 (Nev. 2001). A child witness is only competent if she is able to "receive just impressions and relate them truthfully." *Id.* One of the factors relevant to a child's competence is "the child's ability to remember." *Id.* However, generally, any inconsistent statements or lapses in memory go to the weight of the witness's testimony and not its admissibility. *Walters v. McCormick*, 122 F.3d 1172, 1175 (9th Cir. 1997).

As set forth above with respect to ground 4(E), the state district court found that counsel was not ineffective here because Wommer testified at the evidentiary hearing that he did not object to R.'s testimony because the State had already qualified her to testify. Exh. 109, p. 7. The Nevada Supreme Court summarily rejected this claim. Exh. 124, p. 4 n.2.

At the outset of R's trial testimony, the State elicited testimony that R., age eight at trial, understood the difference between telling the truth and telling a lie.  Exh. 23, p. 4. R. testified that she had a close relationship with her father.  She stated that she did not remember telling her mom or police that her father and E.H. were on top of each other in bed, had sex, or were French kissing.  However, she also testified that E.H. slept over at McMahon's apartment, that the three of them slept in one bed, and that McMahon moved a sleeping R. to a chair one night and R. then saw he and E.H. "play fighting" or "light wrestling."  *See id., e.g.*, pp. 4-7.

The state district court's findings are entitled to deference under the AEDPA. McMahon has not demonstrated that the determination that he failed to show he was prejudiced by Wommer's not requesting a competency exam of R. involved an unreasonable determination of fact or was contrary to or an unreasonable application of clearly established U.S. Supreme Court case law.

**Ground 5(A)**

McMahon alleges appellate counsel continued to represent McMahon even after McMahon fired him as trial counsel, failed to communicate with McMahon, and failed to file a reply brief in the Nevada Supreme Court (ECF No. 31, pp. 30-31).

Under the Sixth Amendment, a defendant who does not require appointed counsel has the right to choose who will represent him.  *See Wheat v. United States*, 486 U.S. 153, 159 (1988); *see also United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006). However, this right is not absolute.  A trial court has wide latitude in balancing the right against the need to avoid conflicts of interest, the need to manage its calendar, and the need to ensure that the trial is conducted within ethical standards.  *Gonzalez-Lopez*, 548 U.S. at 15-52.  An indigent defendant is entitled to the assistance of competent counsel, but is not entitled to the counsel of his choosing nor to any particular relationship with counsel.  *See, e.g., Morris v. Slappy*, 461 U.S. 1, 13-14 (1983).

Wommer testified that he was ultimately appointed on appeal. Exh. 108, pp. 5-77. He explained that he rarely discusses appellate issues with criminal defendants "because it's a legal pleading that is primarily the venue of the attorney." He acknowledged that it was unlikely that he went to speak with McMahon in prison before he filed the direct appeal. He said that he asked the court to appoint him for the appeal because he thought he had the best working knowledge of the case and of the viable appellate issues. Wommer thought that he and McMahon had a good working relationship during the trial. He testified that he did not receive any of McMahon's motions to withdraw counsel until after he had perfected the appeal. Wommer acknowledged that he did not see severance as an issue until he raised retroactive misjoinder as an issue on appeal. *Id.* at 13. He also noted that in retrospect, with the benefit of the Nevada Supreme Court's order affirming the convictions, he still would not have filed a pretrial motion to sever. *Id.* at 15.

At the evidentiary hearing, McMahon named two attorneys and stated that he had contacted each of them about appellate representation. He stated that at his sentencing he informed the court that he was not happy with Wommer and considered their attorney-client relationship terminated at that point. He testified that Wommer never communicated with him a single time after his sentencing, but stated that he did have a copy of the appellate brief to review. *Id.* at 78-105.

The record reflects that after the state district court granted the motion to appoint Wommer on appeal, McMahon filed several motions to withdraw counsel. Exhs. 3, p. 51; exhs. 37, 40, 42. However, McMahon presents no support for his assertion that he fired Wommer immediately upon the conclusion of trial other than his own testimony at the state postconviction evidentiary hearing. Wommer contradicted this testimony, stating that he thought he had a good working relationship with his client and that he initially had an arrangement with McMahon's family to represent him on appeal and then was appointed as counsel for the appeal. *See also* exh. 37 (in Wommer's affidavit in

24

support of his motion to be appointed counsel on appeal, he states that he had an arrangement to be retained as appellate counsel with McMahon's family, but "those arrangements have not come to fruition," thus he sought to be appointed and had already started researching issues and was in the process of perfecting the appeal).

In its order denying the first state postconviction petition, the state district court found Wommer's testimony credible and largely credited his explanations regarding trial strategy. Exh. 109. The court found:

> Defendant also challenges Mr. Wommer's representation on appeal. Defendant claims that Mr. Wommer should have discussed the issues to raise on appeal with him prior to filing the appeal. Mr. Wommer testified that an appeal is based upon the record and Defendant did not present any additional issues he wished to raise on appeal that had merit and he had this post-conviction opportunity to raise any additional claims, Defendant fails to demonstrate that Mr. Wommer was ineffective in not discussing the appeal with Defendant prior to filing the brief.

*Id.* at 9. And the Nevada Supreme Court affirmed:

> McMahon contended that appellate counsel was ineffective for failing to discuss his direct appeal with him. McMahon failed to explain what claims appellate counsel omitted and did not satisfy his burden of proving that any omitted issue would have a reasonable probability of success on appeal. *See Kirksey v. State*, 112 Nev. 980, 998, 923 P.2d 1102, 1114 (1996). Accordingly, we conclude that the district court did not err by denying this claim.

Exh. 124, p. 4.

McMahon simply has not demonstrated what additional issues he wished to raise on appeal. He has not shown that the Supreme Court of Nevada's determination that he failed to establish prejudice involved an unreasonable determination of fact or was contrary to or an unreasonable application of clearly established U.S. Supreme Court case law.

Accordingly, as set forth above, federal habeas relief is denied as to grounds 4(A)-(G), 5(A) and 5(D).

**Remaining IAC Claims**

**Grounds 4(H) and 5(C)**

Finally, the court considers McMahon's claims that his Sixth Amendment right to effective assistance of counsel was violated because Wommer's mental incompetency rendered him unable to provide effective assistance at trial (ground 4(H)) and on direct appeal (ground 5(C)) (ECF No. 31, pp. 28-29, 32).

McMahon raised the allegations that Wommer was mentally incompetent in his second, *pro per* state postconviction petition, filed April 2013. Exhs. 121, 130, 138. He included news articles about Wommer's 2013 trial on federal tax evasion charges that indicated that Wommer raised a diminished capacity defense stemming from a brain injury suffered in a 1991 skiing accident. Exh. 130. He also included the federal court transcripts of Wommer's trial. *Id.* McMahon essentially argued that the ineffective assistance of counsel claims he raised in his first state postconviction petition should be re-litigated in light of the fact that Wommer raised a diminished capacity defense at his federal tax evasion trial.

The Nevada Supreme Court affirmed the denial of the second state postconviction petition as untimely and successive and an abuse of the writ. Exh. 186, p. 2; NRS 34.726(1); NRS 34.810.

With respect to good cause and actual prejudice, the Nevada Supreme Court reasoned:

> Appellant next argued that he had good cause to excuse the procedural bars because of newly discovered evidence that his trial and appellate counsel was later prosecuted for crimes involving dishonesty and that, in his defense, former counsel claimed to suffer from a "diminished capacity" to understand the law due to a decades-old skiing accident. Appellant's argument did not explain why he failed to raise his new claims of ineffective assistance of trial and/or appellate counsel in his first postconviction petition, and accordingly, he failed to overcome any procedural bars to those claims. *See Hathaway v. State*, 119 Nev. 248, 252-53, 71 P.3d 503, 506 (2003). Further, even if such new evidence could demonstrate cause, appellant failed to demonstrate actual prejudice. Neither the district court's denial of appellant's first post-conviction petition,

nor this court's affirmance of that denial, turned on the credibility or even specific legal knowledge of trial and appellate counsel. *See McMahon v. State*, Docket No. 60247 (Order of Affirmance, June 13, 2013).

*Id.* at 4-5.

As with McMahon's previous motion for evidentiary hearing on his federal IAC claims, this court takes judicial notice of its docket in case no. 2:10-cr-0596-GMN-GWF. In that case, Wommer was charged with three counts of structuring financial transactions and one count each of tax evasion and making or subscribing a false tax return, statement, or other document. *Id.*; *see* exh. 161. An Internal Revenue Service (IRS) revenue officer, Kim Clausen, testified that in 2009, she met with Wommer, and they also had several telephone conversations about his missing tax returns for 2007 and 2008. Ultimately, it was determined that Wommer owed about $40,000 for 2007, including penalties and interest. *Id.* at 24. Wommer attempted to negotiate with Clausen to pay the full balance provided that the IRS abated the penalties and interest; and he did in fact pay $25,000. *Id.* at 25. He met with Clausen and completed financial statements regarding his assets and later provided further documentation. *Id.*

A Nevada State bank employee testified that Wommer asked her about IRS garnishments. *Id.* at 115. He withdrew $9,500 that day and asked her if the transaction would trigger a currency transaction report (CTR). When she said that it would not trigger a CTR, he told her that he would be withdrawing $9,500 every day to avoid being reported to the IRS. *Id.* at 117. She testified that the bank has to file a currency transaction report for any transaction over $10,000. *Id.* at 118. Another Nevada State Bank employee testified that Wommer's secretary made several deposits of $9,500 in her personal account at the same bank. Both employees testified that they filled out Suspicious Activity Reports based on both Wommer and his secretary's actions. *Id.* at 144.

Another IRS agent testified that Wommer told him that he had his secretary make those deposits into an account under her name and directed her to hold that money for Wommer until a later point in time. *Id.* at 161. He also testified that Wommer indicated

to him that he was aware of the currency transaction reporting requirements, that he had been a U.S. Attorney in the past and that he had in fact prosecuted structuring offenses in that capacity. *Id.*

A local attorney testified that he met Wommer in 1992 or 1993, they became friends, vacationed together and bought property together. Exh. 162, pp. 10-19. He testified that Wommer was an excellent criminal defense lawyer and that he consulted Wommer for advice about legal strategy and case assessment. *Id.* Wommer's ex-wife, Deborah, testified that Wommer was not the same after the skiing accident, for example, he was easier to anger than before the accident. Exh. 162, pp. 21-40. She acknowledged that he could distinguish right from wrong. *Id.*

Wommer testified in detail as to his meetings and communications with the IRS beginning in 2009 regarding his 2007 and 2008 tax returns. Exh. 162, pp. 42-110. He testified in detail as to what actions he took in response to the IRS inquiries. He explained that he had studied the federal statutes on structuring and money laundering in connection with a case he was assigned as a U.S. Attorney. He confirmed that he made the several withdrawals for less than $10,000 and gave the money to his secretary to deposit in her account. He testified that he paid the IRS $20,000 and then $5,000 that he owed as his 2007 tax liability but agent Clausen "was insistent upon the penalties and interest." *Id.* at 65. Wommer testified that he told her he did not have the remaining $20,000 owed at that time. He testified in detail about his investment in an RV park, and testified that another reason he withdrew the money from his bank accounts was because his girlfriend was an alcoholic and had access to his accounts and he didn't want her to spend his money. *Id.* at 66-68. He testified that the day after he met with agent Clausen and completed a financial form he started withdrawing the sums under $10,000 from his bank accounts and acknowledged that he told a bank employee that he was withdrawing the sums under $10,000 in order to avoid triggering a CTR. *Id.* at 84. He stated that his ski accident occurred in 1991, and he had been in

private practice as a sole practitioner from about 1994 to the time of trial in 2011. *Id.* at 100-101.

A neurosurgeon who treated Wommer after his skiing accident testified that Wommer suffered extensive damage, including multiple skull fractures and permanent damage to his brain's right frontal lobe. Exh. 162, pp. 114-125. A neuropsychologist who examined Wommer in preparation for trial testified that the damage to the right frontal lobe of Wommer's brain likely affected his ability to make rational decisions over emotional impulses and that he exhibited some paranoia. Exh. 162, pp. 127-163. He opined that the injuries diminished Wommer's capacity to form the intent to commit the charged crimes. *Id.* at 143. He also testified that his understanding of the accident was based on what Wommer told him. He also clarified on cross examination that he could not testify as to whether Wommer had diminished capacity with respect to any of the charged crimes but could only opine that Wommer may have had diminished capacity in general. *Id.* at 152-153. A clinical neuropsychologist testified for the State, noting, among other conclusions, that when he evaluated Wommer, Wommer appeared to exaggerate the effects of his brain injury. Exh. 163, pp. 7-56.

The court found Wommer guilty of all five counts, finding that Wommer's own testimony as well as the testimony of the Nevada State Bank employees and IRS agents demonstrated that he acted intentionally and willfully. Exh. 163.

As described above, in affirming the denial of McMahon's second state postconviction petition, the Nevada Supreme Court first stated that McMahon failed to explain why he did not raise the claims that his counsel was mentally incompetent in his first state postconviction petition, and therefore, McMahon failed to overcome the procedural bars to those claims. Exh. 186. The Nevada Supreme Court further reasoned that, "even if such new evidence could demonstrate cause, appellant failed to demonstrate actual prejudice. Neither the district court's denial of appellant's first

postconviction petition, nor this court's affirmance of that denial, turned on the credibility or even specific legal knowledge of trial and appellate counsel." *Id.*

The only evidence that McMahon has cited to in support of grounds 4(H) or 5(C) is the fact that Wommer asserted a diminished capacity defense in his federal criminal trial. Between the state-court record in this case and the record in Wommer's federal criminal case, the claim that Wommer was mentally incompetent to render effective trial and appellate assistance strains credulity. *See U.S. v. Cronic*, 466 U.S. 648, 656 and 666 (setting forth a high bar that to be constructively denied counsel such counsel must have failed to function in any sense as an adversary: "The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been conducted—even if defense counsel may have made demonstrable errors—the kind of testing envisioned by the Sixth Amendment has occurred.").

McMahon has not demonstrated that the Nevada Supreme Court's decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Accordingly, federal habeas relief is denied as to grounds 4(H) and 5(C).

IV. **Certificate of Appealability**

This is a final order adverse to the petitioner. As such, Rule 11 of the Rules Governing Section 2254 Cases requires this court to issue or deny a certificate of appealability (COA). Accordingly, the court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right."  With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct.  *Id*.

Having reviewed its determinations and rulings in adjudicating McMahon's petition, the court finds that none of those rulings meets the *Slack* standard.  The court therefore declines to issue a certificate of appealability for its resolution of any of McMahon's claims.

V.    **Conclusion**

**IT IS THEREFORE ORDERED** that petitioner's second-amended petition (ECF No. 31) is **DENIED** in its entirety.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

**IT IS FURTHER ORDERED** that the Clerk shall enter judgment and close this case.

DATED: 29 September 2017.

_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE